IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

LARRY BARKER                                                          PLAINTIFF

      v.               Civil No.  6:14-cv-06060-PKH-MEF

Advanced Practice Nurse (APN) J. JONES,
Ouachita River Correctional Unit (ORCU);
APN BOETTGER, ORCU;
DR. VOWELL, ORCU;
DR. GREGORY McKINNEY, ORCU;
OFFICER JOHN DOE, Central Transportation,
Arkansas Department of Correction (ADC);
and OFFICER JANE DOE, ADC                                         DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights case filed by the Plaintiff, Larry Barker, pursuant to 42 U.S.C. § 1983.

Plaintiff proceeds *pro se* and *in forma pauperis.*

Plaintiff is incarcerated in the Ouachita River Unit (ORU) of the Arkansas Department of

Correction (ADC).  Plaintiff alleges he was denied adequate medical care resulting in him suffering

an injury to his right foot that ultimately resulted in the foot being amputated.

Defendants filed a Motion for Summary Judgment (Doc. 30) on October 30, 2015.  Plaintiff

filed a Response (Doc. 36) and submitted exhibits (Docs. 48-49).  On April 12, 2016, a hearing was

held to allow Plaintiff to testify in response to the Motion.  Subsequently, Plaintiff filed an additional

response (Doc. 51) and a reply (Doc. 53).  Defendants also filed a reply brief (Doc. 52).  The Motion

(Doc. 30) is now ready for decision.

## I.  BACKGROUND

Prior to his incarceration, the Plaintiff was involved in an accident in which he sustained

severe injuries to his right ankle and foot.  Plaintiff testified that in May of 2011, he suffered from

an insulin induced stroke that diminished the use of his right side.  In June of 2011, Plaintiff injured his right foot on bolts on the floor in a shower while he was incarcerated in the Randall L. Williams Correctional Facility (RLW).  *Plaintiff's Response* (Doc. 36) (hereinafter *Resp.*) at 2.

On August 1, 2011, Plaintiff awoke at 3:00 a.m. and was numb on the right side of his face, his speech was slurred, and he was unable to raise his right hand or use his right leg.  *Plff's Ex.* B-1. He was hospitalized and an MRI of his brain was read as: "acute/early subacute infarction in the left thalamus.  No evidence of hemorrhage."  *Id.*  Plaintiff was able to ambulate with a walker.  *Id.*

On August 19, 2011, Plaintiff was seen complaining of swelling and redness of his right foot. *Plff's Ex.* B-2.  He was put on antibiotics.  *Id.*  He was seen again on October 12, October 15, and November 4, 2011, for continued treatment of his right foot.  *Id.* at B-2 to B-4.  On November 9, 2011, he was seen for continued complaints of a diabetic ulcer on his right foot.  *Plff's Ex.* D.  The area was cleansed; he was prescribed antibiotics; and, he was instructed to not put any weight on his right foot.  *Id.*  He was given an additional prescription for a wheelchair to lessen weight bearing. *Id.*  On January 15 and January 17, 2012, he was seen for treatment of a wound on his right foot. *Plff's Ex.* B-5.

Plaintiff was transferred to the ORCU on January 28, 2012.  *Defts' Ex.* B, *Attach.* 1 at 1.[1] He was seen at the infirmary on January 31, 2012, for treatment of a quarter size wound to the bottom of his right foot that was "surrounded by deadened skin that needs debreeded (sic)."  *Plff's Ex.* B-6.

He was seen on February 3, 2012 for a diabetic stasis ulcer on the right outer ball of his foot. *Defts' Ex.* B, *Attach.* 1 at 3.  It was noted that he had been having this problem for six months.  *Id.*

---

[1] Page citations are to the page number located at the bottom center of the page.

It was noted to be a "3.5 diameter stage 2 stasis ulcer" with a "foul odor, no drainage at present, skin is peeling and at the bottom of the wound the skin is turning dark[,]" with "skin to (sic) pale and coll (sic) to the touch, reddened area just above the wound 5 cm x 3 cm, no edema, tender to palpation." *Id.*  The dead skin was removed and the wound cleaned and dressing applied.  *Id.*  An antibiotic, Cephalexin 500 mg, once a day for seven days, was prescribed.  *Id.*  Plaintiff was to return for worsening symptoms.  *Id.*  His dressing was to be changed Mondays, Wednesdays, and Fridays until February 24, 2012.  *Id.*

On February 6, 2012, the results of a culture were faxed to the ORCU with a request that a doctor in the unit see the results.  *Defts' Ex.* B, *Attach.* 1 at 5.  The culture showed heavy growth of beta hemolytic strep and moderate growth of enterococcus faecalis, and diphtheroid bacilli.  *Id.* at 6.  Plaintiff's antibiotic was changed in accordance with these results.  *Id.* at 4-9.

On February 14, 2012, Plaintiff was seen by Dr. Buchman.  *Defts' Ex.* B, *Attach.* 1 at 10.  It was noted Plaintiff was ambulatory and the exam revealed a 5 by 2 ½ cm callus over the planter lateral aspect of his right fifth metatarsal.  *Id.*  Dr. Buchman recommended that it be cleaned and new dressings applied daily.  *Id.*  The callus was to be trimmed as needed.  *Id.*

On February 29, March 2, March 5, and March 7, 2012, Plaintiff's foot was cleaned, ointment applied and a dry dressing applied.  *Plff's Ex.* B-8.  On April 2, April 4, April 9, April 11, and April 16, 2012, his foot was cleaned, ointment applied, and it was covered with a dry dressing.  *Plff's Ex.* B-9.  On April 3, 2012, layers of dead skin were removed from Plaintiff's right foot.  *Plff's Ex.* B-14.

On April 18, 2012, Plaintiff was seen in the diabetic chronic care clinic.  *Defts' Ex.* B, *Attach.* 1 at 11-14.  On April 21, 2012, Plaintiff was admitted to the hospital in Hot Springs and diagnosed with sepsis and an infected diabetic foot ulcer.  *Defts' Ex.* B, *Attach.* 1 at 15.  He was discharged on

April 25, 2012 with directions to clean and dress the wound daily.

Orders were entered to admit Plaintiff to the ORCU hospital on April 30, 2012, with a right foot infection status post callous debridement from an ulcer. *Defts' Ex.* B, *Attach.* 1 at 18-19; *Plff's Ex.* B-13. It was noted that his right foot was extremely swollen and that his pain had increased until he reported it being almost unbearable. *Id.* at 19. The right foot was noted to be: "extremely edematous and red along with areas of blisters filled with serosanguinous fluid along with areas of green, slimy discoloration. Foul odor, pluses faint, multiple other small abrasions to both lower extremities from shackles, no infection noted there." *Id.* He was started on clindamycin,[2] IV vancomycin,[3] and sulfamethoxazole/trimethoprim.[4] *Id.* A culture was also ordered. *Id.* He was diagnosed with stasis ulcerations of the right foot with callous development on the right fifth metatarsal junction, cellulitis, and Charcot deformity status post ankle fusion. *Id.* at 59.

Plaintiff remained hospitalized and on antibiotics and receiving continual treatment of his foot until June 16, 2012. *Defts' Ex.* B at 2; *Defts' Ex.* B, *Attach.* 1 at 20-59. On May 5, 2012, it was noted that the right foot had less redness, the swelling had decreased, and there was no drainage. *Defts' Ex.* B, *Attach.* 1 at 21. It was noted that the wound was "spongy." *Id.* However, on May 6, 2012, it was noted that his foot was really swollen. *Id.* His foot was cleaned; a large amount of pus was expressed; and, the foot was soaked to remove flaking skin. *Id.* On May 7, 2012, note was

---

[2] Clindamycin is used to treat bacterial infections. https://medlineplus.gov/druginfo/meds/a682399.html (accessed July 22, 2016).

[3] "Vancomycin injection is used alone or in combination with other medications to treat certain serious infections such as endocarditis (infection of the heart lining and valves), peritonitis (inflammation of the lining of the abdomen), and infections of the lungs, skin, blood, and bones." https://medlineplus.gov/druginfo/meds/a601167.html (accessed July 22, 2016).

[4] "The combination of sulfamethoxazole and trimethoprim eliminates bacteria that cause many kinds of infections, including pneumonia and urinary tract and intestinal infections." The combination is usually added to IV fluid. However, the prescription here indicates it will be given by mouth. https://medlineplus.gov/druginfo/meds/a601165.html

made that the area that had been drained the day before had "closed up and has filled back up." *Id.* at 22.   It was noted this would have to be opened up again and drained.   *Id.*   The wound was lanced again.   *Id.* at 23.   On May 10, 2012, a note was made that it appeared that the infection was resolving. *Id.* at 23.   On May 11, 2012, Plaintiff said his foot was worse.   *Id.* at 25.   The clindamycin was discontinued and intravenous (IV) vancomycin was added.   *Id.*   Once again his foot appeared to be getting better.   *Id.* at 26.   On May 17, 2012, and May 22, 2012, notes were made that the cellulitis was resolving.   *Id.* at 30 & 32.   The infection continued to improve but Plaintiff remained hospitalized.    On May 19, 2012, Dr. McKinney first saw the Plaintiff.   *Defts' Ex.* B at 2; *Defts' Ex.* B, *Attach.* 1 at 38.   On June 5, 2012, Plaintiff was instructed that he needed to get out of bed and ambulate more often.   *Defts' Ex.* B, *Attach.* 1 at 45.

On June 7, 2012, PA Jones requested a consult with podiatry or a perdorthist for proper shoe fitting.   *Defts' Ex.* B, *Attach.* 1 at 47.   It was noted that Plaintiff had been hospitalized for "stasis ulceration of right foot along with callous development on right fifth tarsal metatarsal junction."  *Id.* PA Jones noted that Plaintiff had Charcot's deformity with limited mobility and functionality of the right foot.   *Id.*   Charcot foot has been defined as follows:

> Charcot neuropathic osteoarthropathy (CN), commonly referred to as the Charcot foot, is a condition affecting the bones, joints, and soft tissues of the foot and ankle, characterized by inflammation in the earliest phase.   The Charcot foot has been documented to occur as a consequence of various peripheral neuropathies; however, diabetic neuropathy has become the most common etiology.   The interaction of several component factors (diabetes, sensory-motor neuropathy, autonomic neuropathy, trauma, and metabolic abnormalities of bone) results in an acute localized inflammatory condition that may lead to varying degrees and patterns of bone destruction, subluxation, dislocation, and deformity.   The hallmark deformity associated with this condition is midfoot collapse, described as a "rocker-bottom" foot (Fig. 1), although the condition appears in other joints and with other presentations.   Pain or discomfort may be a feature of this disorder at the active (acute) stage, but the level of pain may be significantly diminished when compared with individuals with normal sensation and equivalent degrees of injury.

The Charcot Foot in Diabetes, http://care.diabetesjournals.org/content/34/9/2123 (accessed July 22, 2016).

On June 13, 2012, Dr . McKinney submitted a consultation request because of Plaintiff's unexplained anemia.  *Defts' Ex.* B, *Attach.* 1 at 55.  On June 14, 2012, it was noted a CT showed "severe atrophy of the right kidney and compensatory hypertrophy of the left."  *Id.* at 57.

Plaintiff was discharged from the hospital on June 16, 2012, by Dr. McKinney.  *Defts' Ex.* B, *Attach.* 1 at 59; *Plff's Ex.* B-12.  It was noted that Plaintiff had limited mobility and functionality of his right foot and was unstable to ambulate in normal soft shoes.  *Id.*  Plaintiff would be seen by Felix Brace for proper shoe fitting.  *Id.*  Urology was also going to be consulted regarding his kidneys.  *Id.*  It was noted that Plaintiff was in a wheelchair but could ambulate for short periods with a walker.  *Id.*

On July 3, 2012, Plaintiff was evaluated by Leland Felix of Arkansas Orthotic and Prosthetic, and he recommended Dr. Comfort shoes with custom arch supports.  *Defts' Ex.* B, *Attach.* 1 at 60.  Plaintiff was seen in chronic care on July 27, 2012, and it was noted that his right foot infection was healed.  *Defts' Ex.* B, *Attach.* 1 at 61-62.

On October 17, 2012, Dr. Vowell first saw the Plaintiff and noted that his ankle was malformed and he had a severe inversion of the foot.  *Defts' Ex.* B, *Attach.* 1 at 65; *Defts' Ex.* C at 1.  When he walked he did so on the outside of his foot.  *Defts' Ex.* C at 1.  This was the reason he frequently had ulcers.  *Id.*  She wanted him re-evaluated by Mr. Felix for a fitted shoe lift and ankle brace.  *Defts' Ex.* B, *Attach.* 1 at 65; *Defts' Ex.* C at 1.

On November 6, 2012, Plaintiff was seen again by Mr. Felix.  *Defts' Ex.* B, *Attach.* 1 at 66; *Plff's Ex.* F.  Mr. Felix noted Plaintiff's ankle rolled outward and the lower end of the fibula was protruding posteriorly.  *Id.*  Mr. Felix was going to issue new shoes but recommended that Plaintiff

-6-

be seen by Dr. Schock, an orthopedist.  *Id.* at 66.

On December 4, 2012, Plaintiff was seen by Mr. Felix to be evaluated as to whether an ankle foot arthrosis (a brace) was needed to stabilize the right ankle.  *Defts' Ex.* B, *Attach.* 1 at 67.  Mr. Felix indicated it would work, but that Plaintiff did not want to put forth the effort to achieve success.  *Id.*  Mr. Felix indicated he would see the Plaintiff on an as needed basis if he changed his attitude.  *Id.*

On December 27, 2012, Dr. Vowell performed a record review noting Mr. Felix's findings; and, after discussing them with the Plaintiff, the Plaintiff wanted a second opinion with a surgeon. *Defts' Ex.* B, *Attach.* 1 at 69; *Defts' Ex.* C at 1.  She put Plaintiff on the list to be evaluated at one of Dr. Schock's orthopedic clinics.  *Id.*

X-rays of Plaintiff's right ankle taken on December 27, 2012, showed a "complete destruction of the tibiotalar joint with collapse of the talar and tibial articular surfaces," and "extensive periarticular fragmentation."  *Defts' Ex.* B, *Attach.* 1 at 68.  Dr. Vowell noted that Plaintiff had been seen by Mr. Felix who believed Plaintiff had "reached maximal medical intervention."  *Id.* at 69.  It was noted that Dr. Schock should be asked to evaluate.  *Id.* at 69.

On January 4, 2013, Plaintiff was seen by APN Boettger.  *Plff's Ex.* C.  He was on two different kinds of insulin and wanted to be on just one kind.  *Id.*  It was noted he had a history of insulin induced stroke from receiving too high a dose of insulin in the past.  *Id.*  His prescription was changed to only one type of insulin, and the dosage was increased to compensate for the discontinuation of the other type of insulin.  *Id.*

On February 13, 2013, Plaintiff submitted a medical request saying he had swelling, blistering, and discoloration of his right leg.  *Defts' Ex.* B, *Attach.* 1 at 70.  His lower right leg was warm to the touch and "pink with small raised blisters with pitting 2 + edema.  Pulse is elevated."

*Id.* APN Boettger prescribed "sulfameth-tri-meth" for fourteen days. *Id.* On March 11, 2013, his

leg was once again pink and warm to the touch. *Id.* at 71. APN Boettger prescribed Minocycline[5]

for ten days. *Id.*

The orthopedic consult with Dr. Schock did not occur until March 20, 2013. *Defts' Ex.* B,

*Attach.* 1 at 72. Dr. Schock noted the right ankle was "totally destroyed by infection, stuck in varus

position preventing him from walking." *Id.* Dr. Schock recommended that the Plaintiff have a

below the knee amputation. *Id.*

By affidavit, Dr. Vowell indicates she has no idea why the Plaintiff was not seen by Dr.

Schock until March 20, 2013. *Defts' Ex.* C at 1. Once she put Plaintiff's name in, she has nothing

further to do with the appointment. *Id.* It is her opinion, however, that the delay in the Plaintiff

seeing Dr. Schock did not affect Plaintiff's prognosis. *Id.* at 2. She states that Plaintiff's "ankle and

foot were already beyond repair. I was not surprised that amputation was recommended." *Id.*

Dr. McKinney is also of the opinion that the Plaintiff was not harmed by the amount of delay

in seeing Dr. Schock. *Defts' Ex.* B at 9. He notes that Plaintiff's "ankle was already destroyed in

December. There would have been no change in prognosis." *Id.*

In early April, 2013, Plaintiff started going to the clinic for treatment of a hard callous on the

outer edge of his right foot. *Defts' Ex.* B, *Attach.* 1 at 73. On April 3, 2013, APN Boettger removed

the layers of dead skin. *Id.* He was noted to have no feeling in his right foot and stated he did not

need anesthetic for the debridement. *Id.*

On May 2, 2013, APN Boettger saw him for treatment of an open sore and a callous on his

right outer foot. *Defts' Ex.* B, *Attach.* 1 at 74. The sore measured 3/10 cm by 4/10 cm with a small

---

[5] An antibiotic used to treat bacterial infections.  https://medlineplus.gov/druginfo/meds/a682101.html
(accessed July 26, 2016).

amount of blood tinged/yellow drainage noted. *Id.* The callous was shaved down to the level of the sore and the sore debrided. *Id.* Dr. McKinney notes that when Plaintiff would get out of his wheelchair to step, he would do so on the outside of his foot. *Defts' Ex.* B at 4. This was the reason he developed callouses and ulcers there. *Id.*

On May 21, 2013, it was noted that the callus had built up around the wound. *Defts' Ex.* B, *Attach.* 1 at 75. APN Boettger noted that the wound was not healing. *Id.* The callous was again debrided. *Id.* Throughout the month of June, 2013, Plaintiff continued to suffer from the open wound with the callus surrounding it. *Id.* at 76.

On June 20, 2013, APN Boettger put the Plaintiff on bed rest. *Plff's Ex.* A. She specified he was not to "stand or walk on right foot" and was to be pushed in a wheelchair. *Id.* The restrictions ended on June 19, 2014. *Id.*

On June 27, 2013, Plaintiff was sent to the health services office with a fever and urinary issues. *Defts' Ex.* B, *Attach.* 1 at 76-79. He was given antibiotics, Ibuprofen, and Acetaminophen, and his temperature was monitored. *Id.* at 77. He was admitted to the hospital. *Id.* at 78. When the lab results came in, Dr. Vowell changed the antibiotics. *Id.* at 79-81. Plaintiff remained hospitalized through the time of his below-the-knee amputation on August 12, 2013. *Id.* at 77-182.

On June 28, 2013, it was noted that he had an infection of unknown source and a right foot ulcer. *Defts' Ex.* B, *Attach.* 1 at 82. On July 1, 2013, x-rays were taken of his right foot again. *Id.* at 87. It was noted that there was a "[r]edemonstration of severe destructive changes at the tibiotalar joint most consistent with neuropathic arthropathy" and "moderate soft tissue edema of the foot." *Id.* Plaintiff remained hospitalized for "IV antibiotics and wound care." *Id.* at 89. He was diagnosed with cellulitis of the right foot. *Id.* at 91.

On July 5, 2013, a large amount of "bloody pussy fluid" was removed from his right foot by

Dr. McKinney. *Defts' Ex.* B, *Attach.* 1 at 98 & 112.  Dr. McKinney ordered pain medication, lab work, and continued Plaintiff's other medications.  *Id.* at 99.  Dr. McKinney also discussed Plaintiff's elevated blood sugar with him and the need for him to follow his diet.  *Defts' Ex.* B at 5.

The wound was drained again on July 9, 2013, with only a moderate amount of bloody drainage.  *Id.* at 105.  On July 10, 2013, it was noted that the top of Plaintiff's right foot was "very red, erythematous, and edematous."  *Id.* at 107.  Intravenous antibiotics were to be continued until an MRI could be done of the ankle.  *Id.* at 109.

An MRI scheduled for July 15, 2013, was not done because of a transportation issue.  *Defts' Ex.* B, *Attach.* 1 at 119, 121.  Plaintiff had refused to transfer from the wheelchair to the van because he might injure his foot.  *Id.*

The MRI was done on July 17, 2013, with the diagnostic impressions listed as:

1. Extensive osseous abnormalities are noted involving the talus with less extensive abnormalities involving the navicular and calcaneus.  Differential includes osteomyelitis, Charcot arthropathy, and seguela of severe trauma.  Extensive soft tissue edema and enhancement is also present.
2. Tenosynovitis may be present involving the extensor tendon group.

*Defts' Ex.* B, *Attach.* 1 at 125.  When the Plaintiff returned from the MRI, his vital signs were within normal limits and he voiced no complaints.  *Defts' Ex.* B, *Attach.* 1 at 121-123; *Defts' Ex.* B at 5.

Dr. Vowell evaluated Plaintiff's MRI of the foot on July 18, 2013.  *Defts' Ex.* B, *Attach.* 1 at 125; *Defts' Ex.* C at 2.  According to Dr. Vowell "[t]he results indicated that [Plaintiff's] foot was totally destroyed.  There was no normal anatomy."  *Defts' Ex.* C at 2.  Dr. Vowell indicates she discussed the case with PA Jones and the decision was made to "administer IV vancomycin for six weeks unless and until other treatment decisions, including a below-the-knee amputation, were considered."  *Defts' Ex.* B, *Attach.* 1 at 127; *Defts' Ex.* C at 2.

On July 22, 2013, note was made that Plaintiff had mentioned a few times during this

-10-

hospitalization that maybe the foot should be cut off. *Defts' Ex.* B, *Attach.* 1 at 133. It was noted

that this option had been presented to him in the past. *Id.* An MRI of his ankle was ordered. *Id.* at

127.

On July 23, 2013, APN Boettger talked to Plaintiff about amputating his right foot due to

chronic osteomyelitis. *Id.* at 138. Plaintiff responded that his wife did not want his foot cut off and

would rather it get fixed after he was released. *Id.*

The MRI of his right ankle was done on July 23, 2013. *Defts' Ex.* B, *Attach.* 1 at 141. The

diagnostic impression was:

> 1. Abnormal tibiotalar joint with joint space loss, irregularity of the tibial plafond
> and talar dome and extensive talar collapse with varus angulation of the ankle and
> hindfoot. These findings may represent a combination of posttraumatic arthropathy
> or Charcot joint.
> 2. Extensive edema and enhancement of the talus which could represent changes of
> osteomyelitis. Additional edema and enhancement is noted in the distal tibia,
> navicular bone, and calcaneus.

*Id.* When he returned, Plaintiff did not voice any discomfort. *Id.* at 137-139. Later that evening,

he had no complaints, denied being in pain, and no redness or swelling was noted. *Id.*

Plaintiff's dressing was changed the morning of July 24, 2013, and Plaintiff voiced no

complaints and there were no signs or symptoms of infection on his right foot. *Defts' Ex.* B, *Attach.*

1 at 140-142. Later that morning, Plaintiff again voiced no complaints. *Id.* It was not until 5:37

p.m. on July 24, 2013, that Plaintiff for the first time stated that he was forced to walk the day before

to get up into the transportation van. *Id.* at 142. He said his right leg from the ankle to his knee had

been painful all morning. *Id.*

On July 25, 2013, APN Boettiger advised Plaintiff he would be getting a PICC[6] line for

---

[6] A percutaneous inserted central catheter.

-11-

continued IV antibiotics.  *Defts' Ex.* B, *Attach.* 1 at 144.  She also discussed with him the possibility of amputation of the foot as one of his options.  *Id.*

On July 26, 2013, APN Boettger wrote: "Spoke with [inmate] about amputation and then being fitted for prosthetic which would enable him to walk vs. always being in a [wheel chair] and he is in agreement with this plan.  Discussed with both Dr. Vowell and Dr. McKinney."  *Id.* at 146. Dr. Vowell indicates she and Dr. McKinney had an in-depth discussion with the Plaintiff regarding his foot condition and treatment alternatives.  *Defts' Ex.* C at 2.  She states:

> He could no longer walk due to the extensive damage to and deformity of his foot and ankle.  He informed us that he wanted to walk; thus, we all agreed on a plan for a below-the-knee amputation of his right extremity, followed by him being fitted with a prosthetic, which would enable him to walk rather than be in a wheelchair.  At Mr. Barker's request and with our agreement, APN Boettger submitted a surgery consult for below-the-knee amputation.  I initialed the consult which had been approved by the Regional Medical Director.  If Mr. Barker changed his mind or decided that he did not want his ankle and foot amputated, then it would not have been amputated and we would have continued to treat the infection.

*Defts' Ex.* C at 2; *Defts' Ex.* B, *Attach.* 1 at 146.

Dr. McKinney indicates that the results of the MRI showed Plaintiff's right ankle was destroyed, as was his foot, consistent with the assessment offered by Dr. Schock earlier in March. *Defts' Ex.* B at 7.  Dr. McKinney also states that Plaintiff could have said no to the amputation, and they would have continued to treat his foot infections as needed.  *Id.* at 9-10.

On July 29, 2013, the PICC line was inserted so Plaintiff's antibiotics could be more easily administered.  *Defts' Ex.* B, *Attach.* 1 at 153-154.  Plaintiff remained on the ward and received his medication and dressing changes.  *Id.*

On August 8, 2013, a note was made that a surgical amputation of his foot was being scheduled.  *Defts' Ex.* B, *Attach.* 1 at 167.  On August 9, 2013, Nurse Miller noted the Plaintiff said he would be having surgery on his foot the following Monday.  *Id.* at 175.  She noted he appeared

-12-

a little withdrawn and concerned about the surgery.  *Id.*  She allowed him to vent his concerns and

fears.  *Id.*

     Nurse Miller saw the Plaintiff again on August 11, 2013, and he told her he was having the

surgery the following day.  *Defts' Ex.* B, *Attach.* 1 at 180-181.  She instructed him on pre-op and

post-op procedures.  *Id.*

     On August 12, 2013, the surgeon noted that Plaintiff elected to proceed with the amputation

process.  *Defts' Ex.* B, *Attach.* 1 at 183-186.  Plaintiff's right foot was amputated.  *Id.*

     By affidavit, Dr. McKinney states that:

> [i]n my opinion, Mr. Barker received textbook care.  Specifically, the care and
> treatment that he received for his foot and ankle and the relating infections and
> deformity - the evaluations, diagnostic testing, lab work, medication administration
> and amputation decision - followed the standard of care.  In my opinion, he received
> excellent care and treatment during this time.

> Mr. Barker was wheelchair-bound and was not using his foot.  He continued to have
> infections and there was nothing that could be done to make him walk again without
> a below-the-knee amputation.  He had osteomyelitis and Charcot foot and trauma and
> diabetes and necrosis and ulcerations, and all of these conditions, taken together,
> indicated a poor outcome.  There was nothing to fix and, other than battling ulcers
> and infections, there was no chance of significant improvement.  The x-rays and
> MRIs provided the objective evidence of the destroyed foot and ankle.

*Defts' Ex.* B at 8-9.

     Further, Dr. McKinney states he understands that Plaintiff complained that PA Jones told

Plaintiff he could stand on his foot to get into the van for MRI transport.  *Defts' Ex.* B at 9.  Dr.

McKinney sees "nothing medically wrong with this instruction, if it occurred.  Mr. Barker was able

to ambulate from his wheelchair to his bed and from his wheelchair to the toilet and there would be

little difference for him, in his physical situation, to ambulate from a wheelchair into a van."  *Id.*

     Dr. Vowell indicates she agrees with Dr. McKinney that allowing the Plaintiff to step from

the wheelchair into the transport van was not inappropriate.  *Defts' Ex.* C at 2.  She stated:

He could use his good leg to step and the activity would have been similar to him moving from the chair to the toilet or the chair to his bed.  Also, considering the record for the 24 hours post-transport, he was not medically injured by moving from the wheelchair to the van.

*Id.*

She states it is her professional opinion that the treatment Plaintiff received was appropriate and satisfactory for his foot and ankle condition.  *Defts' Ex.* C at 2.  She saw no evidence of Dr. McKinney, APN Boettger, PA Jones, or herself doing "anything inappropriate or which would have harmed his outcome."  *Id.* at 3.

From December, 2012 until August, 2013, Plaintiff alleges his foot was improperly treated. Plaintiff believes he should have been referred to an outside provider so that he could obtain a diagnosis of the severity of his foot condition and to receive an aggressive treatment plan.

Plaintiff sued PA Jones for allegedly instructing officers to tell Plaintiff to get out of his wheelchair and get into the prison van, which caused Plaintiff's foot injury to break open, bleed, and caused tremendous pain.

Plaintiff sued Dr. Vowell because she referred him to Dr. Schock, but it took four months to see Dr. Schock, and when he did, Dr. Schock's only suggestion was to cut his foot off.

Plaintiff sued APN Boettger and Dr. McKinney claiming that in July, 2013, when Plaintiff got extremely sick and his right leg and foot were swollen and red, they told Plaintiff he would receive IV antibiotics for six weeks.  *Defts' Ex.* D at 55.[7]  However, after only a three weeks, APN Boettger told him he was being sent out for a foot amputation that same day.  *Id.*  Plaintiff also testified they were not keeping him updated on his foot, and he thought "they were going to get his

---

[7] This exhibit is portions of the Plaintiff's deposition.  Page references are to the deposition page number not the CM/ECF page number.

foot fixed, and I wasn't going to have to - they didn't mention anything about having my foot off."
*Id.*

## II.  APPLICABLE STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995).

The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  The Court must view all evidence and inferences in a light most favorable to the nonmoving party.  *See McCleary v. ReliaStar Life Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.  DISCUSSION

Defendants have moved for summary judgment on the following grounds: (1) Plaintiff exhausted his administrative remedies only as to his allegation about Dr. Vowell referring him to Dr. Schock after he asked for a second opinion, and (2) there is no evidence of deliberate indifference

on the Defendants' part.  In fact, Defendants argue Plaintiff received a "plethora of good, thorough medical care and treatment during the time frame in question."  Doc. 30 at 2 ¶ 7.

### A.  Section 1983

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution.  *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).  The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

### B.  Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA"), mandates exhaustion of available administrative remedies before and inmate files suit.  Section 1997e(a) of the PLRA provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U. S. C. § 1997e(a).

In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded that "exhaustion [as required by the PLRA] is not *per se* inadequate simply because an individual later sued was not named in the grievances." *Id.* at 219.  "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Id.* at 218 (internal quotation marks and citation omitted).  The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system

-16-

and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.*

The Eighth Circuit Court of Appeals has recognized only two exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures; or, (2) when the officials themselves fail to comply with the grievance procedures. *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (citing *Miller v. Norris*, 347 F.3d 736 (8th Cir. 2001); *Foulk v. Charrier*, 262 F.3d 687 (2001)). Neither of these exceptions apply to Plaintiff's situation.

According to the ADC Administrative Directive 12-16, there are three primary steps to the grievance process. *Defts' Ex.* A at 3.[8] Step One is the Informal Resolution Procedure. *Id.* At Step One, the inmate should submit a Unit Level Grievance Form "within 15 days after the occurrence of the incident." *Id.* at 7 ¶ E(1). The Policy requires the inmate to "specifically name each individual involved for a proper investigation and response to be completed by ADC." *Defts' Ex.* A at 4 ¶ C(4). Only one problem/issue should be stated in a grievance. *Id.* at 7 ¶ D(2). The inmate is directed to provide a "brief statement that is specific as to the substance of the issue or complaint to include the date, place, personnel involved or witnesses, and how the policy or incident affected the inmate submitting the form." *Id.* at 7 ¶E(2).

The form is given to a problem solver whose name is posted in the housing unit. *Defts' Ex.* A at ¶ E(3). If no problem solver is available, any staff member holding the rank of sergeant or above can collect the grievance and act as the problem solver. *Id.*

A problem solver investigates and provides a written response at the bottom of the form.

---

[8] Page references for this exhibit are to the CM/ECF page number located in the upper right corner.

*Defts' Ex.* A at ¶ E(4).  The problem solver must "meet with the inmate within three working days to revolve the issue."  *Id.*  If the problem solver has failed to contact the inmate within three days, the inmate may proceed to Step 2.  *Id.* at 9 ¶ E(11).  "In that instance, Step 2, the formal grievance, must be filed no later than six (6) working days from the submission of the Unit Level Grievance Form pursuant to Step 1."  *Id.* at 9-10 ¶ E(11).

Step Two is the Formal Grievance Procedure.  *Defts' Ex.* A at 4.  At this step, the inmate files a formal grievance on the same unit level grievance form and deposits it in the designated grievance box.  *Id.* at 10 ¶ F(1).  This must be done "within three (3) working days from receipt of [the] response" to Step One.  *Id.* at ¶ E(11).  The inmate should receive an acknowledgment or rejection notice within five working days after receipt.  *Id.* at 11 ¶ F(4).  No acknowledgment is required if a written response to the grievance is made within five working days.  *Id.*  If the grievance is medical or mental health related, it is forwarded to the Health Services Administrator (HSA).  *Id.* at ¶ F(5)(a).  The inmate should receive a written response by the Warden or Warden's designee within 20 working days.  *Id.* at 12 ¶ F(7).

If the inmate is not satisfied with the response, or he fails to receive a response within 20 working days from the submission of Step 2, he may appeal to the Deputy Director.  *Defts' Ex.* A at  12 ¶ F(7).  The appeal must be submitted "within five (5) working days" after receiving a response to Step Two.  *Id.* at ¶ F(8).

Step Three is the Appeal to the Chief Deputy/Deputy/Assistant Director Level.  *Defts' Ex.* A at 13 ¶ G.  Appeals relating to medical, mental health, or treatment program issues are submitted to the Deputy Director for Health and Correctional Programs.  *Id.* at ¶ G(4).

This lawsuit was filed on May 7, 2014.  According to Defendants, Plaintiff exhausted his administrative remedies with respect to the following grievances prior to the date this lawsuit was

filed: OR-13-00156; OR-13-01640; and, OR-14-00018. The Deputy Director also responded to OR-13-01123. This grievance is therefore considered to have been exhausted.

In OR-13-00156, submitted February 11, 2013, Plaintiff complained about two issues: (1) PA Jones was unable to debride Plaintiff's foot on several occasions and said he would call Plaintiff to the hospital for it to be done. Plaintiff complained it still had not been done and he did not want to see his foot "rot off;" and, (2) APN Boettger informed him that he would probably not walk again so he asked for a second opinion. He was told in December, 2012, that Dr. Vowell would put him on the list to be evaluated by Dr. Schock. As of the date of the grievance, Plaintiff stated he had not been seen by Dr. Schock.

In response, he was told that he was on the list to see Dr. Schock but that pursuant to policy he could not be told when the appointment was. Plaintiff appealed saying the issues grieved with PA Jones had not been addressed. *Defts' Ex.* A at 22. In response, he was told that "[b]ecause of the time it has taken to heal you will be scheduled to see Dr. Schock on 3/20/13 to see if he has any additional recommendations." *Id.* at 23. Plaintiff appealed again saying that when he asked for a second opinion he meant for it to come from a doctor not associated with Corizon. *Id.* He also noted that the issues grieved with respect to PA Jones had not been addressed. *Id.*

In response, he was reminded that the grievance policy only allowed one problem or issue to be addressed, *i.e.*, Dr. Vowell's referral of Plaintiff to Dr. Schock. *Defts' Ex.* A at 24. This is the reason the issue with respect to PA Jones was not addressed. *Id.*

It was noted that he had been seen by Dr. Schock, the in-house orthopedic physician, who concluded Plaintiff's right ankle had been totally destroyed by infection and was stuck in a position that prevented him from walking. *Defts' Ex.* A at 24. It was noted that Dr. Schock did not want to try a brace due to skin breakdown. *Id.* Dr. Schock recommended that Plaintiff consider having a

below the knee amputation. *Id.* Plaintiff was to be scheduled to see Dr. McKinney to see if he had other recommendations. *Id.* Plaintiff was advised that neither Dr. Schock nor Mr. Felix were Corizon employees. *Id.*

Plaintiff has exhausted his claim about Dr. Vowell's referral of him to Dr. Schock. While it is tempting to also address the claim against PA Jones, we cannot do so without ignoring the holding of *Jones*, 549 U.S. at 219, that it is the prison's requirements that define the boundaries of proper exhaustion.

In OR-13-01123, submitted on August 27, 2013, Plaintiff noted his right foot was cut off on August 12, 2013. *Defts' Ex.* A at 25. He asserted that the amputation was due to the deliberate indifference on the part of Corizon employees. *Id.* He then stated he could not recall all the employees names or the dates and times but that his medical records would contain this information. *Id.* Had he not been in prison and was able to seek medical attention on his own, Plaintiff felt that he would not have lost his foot. *Id.*

In response to the grievance, Plaintiff was notified that the matter was referred to medical. *Defts' Ex.* A at 25. Plaintiff was also advised to submit a sick call request for current medical issues. *Id.* Plaintiff appealed because he felt his grievance was not addressed. *Id.*

On November 22, 2013, Plaintiff wrote Wendy Kelley, then Deputy Director, regarding this grievance, stating that he had proceeded to step two but he had not received a response. *Id.* at 27. He asked Deputy Director Kelley to investigate and respond to his grievance. *Id.*

The HSA found, in an undated response, that the grievance was without merit noting that "[r]ecords reflect you had chronic osteomyelitis (infection in the bone) and were treated with multiple oral, intramuscular, and intravenous antibiotic therapy and wound care treatments, but the infection was not responsive: therefore, requiring an amputation of your right foot." *Id.* Plaintiff

-20-

appealed.

By decision dated January 24, 2014, Plaintiff's appeal was found to be without merit.  *Defts'*
*Ex.* A at 29.  He was informed that he did not give specific information in his Step One informal
resolution or his appeal "to support his allegations of deliberate indifference to your medical needs.
Without such information, your allegations cannot be properly investigated."  *Id.*

Defendants note that Plaintiff had previously named, and/or the response to his first grievance
named, PA Jones, APN Boettger, Dr. Vowell, Dr. Schock, and Dr. McKinney.  Additionally,
Defendants point out that at the time he submitted this grievance, Plaintiff was in the unit hospital
in the midst of Corizon staff.

In his response to the summary judgment motion, Plaintiff maintains this grievance dealt with
the employees who treated him after he injured his right foot on bolts in the shower.  *Plaintiff's*
*Response* (Doc. 36) (hereinafter *Resp.*) at 2.  He says he did not know the names of the Corizon
employees working in the RLW complex in June, 2011.  *Id.*  He notes he asked in his grievance that
the investigator refer to his medical records to ascertain relevant employees, times, and dates, in Pine
Bluff.  *Id.*  He also argues that he put the blame for his foot amputation on the RLW complex and
the injury of his foot there in the complaint he filed in this case.  *Id.* at 3.

This argument is without merit.  First, Plaintiff does not mention the RLW complex or the
date June, 2011 in the grievance.  Second, the grievance procedure requires the unit level grievance
to be filed within fifteen days after the occurrence of the incident.  *Defts' Ex.* A at 7.  Finally, the fact
that he mentioned the date of the original injury, and said it occurred at RLW in his Complaint filed

in this case, has no bearing on the grievance he filed prior to filing the Complaint.[9]  Plaintiff did not exhaust his administrative remedies with respect to the Defendants in this case.

In Grievance OR-13-01640, Plaintiff complained he had been out of aspirin and simvastatin[10] for two weeks. *Defts' Ex.* A at 30.  Grievance OR-14-00018 also dealt with Plaintiff's prescriptions for aspirin and simvastatin. *Id.* at 34.  Neither grievance mentioned the Defendants in this case, nor is there any evidence of record suggesting that any of the named Defendants were responsible for filling prescriptions in a timely manner.

After reviewing the ADC grievance procedure and the grievances submitted by the Plaintiff, I must conclude that Plaintiff has failed to exhaust his administrative remedies with respect to PA Jones, APN Boettger, and Dr. McKinney.  They are entitled to summary judgment.  With respect to Dr. Vowell, Plaintiff has exhausted his administrative remedies as to his claim regarding her referral to Dr. Schock for evaluation.

### C. Denial of Medical Care

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  To prevail on a denial of medical care claim, a plaintiff must show: (1) the existence of an objectively serious medical need, (2) that the defendants knew of and deliberately disregarded. *Vaughn v. Gray*, 557 F.3d 904, 908-09 (8th Cir. 2009).

Defendants' mental state must be akin to "criminal law recklessness, which is more

---

[9] The RLW employees Plaintiff has identified and maintains were the subject of this grievance are not parties to this case.  The RLW employees were severed when this case was filed and transferred to the Eastern District of Arkansas.  Apparently, service was not perfected on them and the case was dismissed. *See Resp.* at 11-13.

[10] This drug is used to reduce the risk of heart attack and stroke and to decrease the amount of cholesterol and fatty substances in the blood.  https://medlineplus.gov/druginfo/meds/a692030.html (accessed July 21, 2016).

blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate . . . . Deliberate indifference must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision." *Schaub v. VonWald*, 638 F.3d 905, 914-15 (8th Cir. 2011) (internal quotation marks and citations omitted). This standard is not met by the exercise of professional judgment in refusing to implement an inmate's requested course of treatment. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (constitutional violation cannot rest on mere disagreement with treatment decisions); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (inmates have no constitutional right to particular course of treatment, and doctors are free to use their own medical judgment); *Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997) (prison doctors not deliberately indifferent where they treated the prisoner and offered sensible medication).

Plaintiff sued Dr. Vowell because she referred him to Dr. Schock, but he did not get to see Dr. Schock for several months. When he did see Dr. Schock, his only recommendation was a below-the-knee amputation. Plaintiff notes that Mr. Felix had recommended he be referred to Dr. Schock on November 6, 2012. *Resp.* at 6. He also argues that Mr. Felix had not given up on saving his foot. *Id.* Plaintiff rhetorically asks: "[t]he question is if the ankle and foot were already beyond repair in December 2012, why would the 'attitude of the Plaintiff' to put forth effort to achieve success as Dr. Felix's notations state at the time, make any difference of the potential out come of the prognosis or future examinations?" *Id.* at 8. Plaintiff believes Dr. Vowell knew the delay in required medical treatment "would affect the plaintiff's prognosis." *Id.* Plaintiff maintains the "true reason he was not seen until 3-20-13 would be because Dr. Vowell . . . had given up on treating the underlying problem and failed to schedule the appointment intentionally because [she] deemed it to be a waste of time." *Id.* Plaintiff argues he was not scheduled to see Dr. Schock until after he filed Grievance

-23-

OR 13-00156.

Where an inmate alleges a delay in medical treatment, "the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (internal quotation marks and citation omitted). "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of [the] delay." *Martinson v. Leason*, 22 F. Supp. 3d 952, 965 (D. Minn. 2014) (internal quotation marks and citation omitted).

Here, the summary judgment record contains no such verifying medical evidence. Further, there is evidence that supports Dr. Vowell's opinion that the "delay in Mr. Barker seeing Dr. Schock did not affect his prognosis." *Defts' Ex.* C at 2. The July 15, 2013, MRI results indicate extensive abnormalities. *Defts' Ex.* B, *Attach*. 1 at 125. Bluntly stated, Dr. McKinney indicates these results show the Plaintiff's right ankle and foot were destroyed. *Defts' Ex.* B at 7.

The December 20, 2012, x-rays showed "complete destruction of the tibiotalar joint with collapse of the talar and tibial articular surfaces. Extensive periarticular fragmentation." *Defts' Ex.* B, *Attach.* 1 at 68. Dr. Mckinney also agrees that any delay in the Plaintiff seeing Dr. Schock did not affect his prognosis. *Defts' Ex.* B at 9.

Further, Dr. McKinney clarifies that the infection and the destruction of the bone structure of the foot are different issues. He states:

> Mr. Barker's ankle was physically destroyed. The infections were just another problem. He was prescribed IV vancomycin for six weeks in order to treat and resolve the *infection*. The amputation decision, however, was *not* related to the infection. I specifically discussed alternatives with Mr. Barker and his decision to amputate was so that he would be able to walk again so he could get out of the wheelchair. We put in a surgical consult at Mr. Barker's request. Prescriptions to resolve the infections would never repair the joint. Improvement was impossible without amputation.

*Defts' Ex.* B at 9.

Based on the summary judgment record, there are no issues of material fact as to whether Dr. Vowell was deliberately indifferent to the Plaintiff's serious medical needs. While the outcome was unfortunate to say the least, there is no genuine issue of material fact as to whether it was due to Dr. Vowell's deliberte indifference to the Plaintiff's serious medical needs.

## IV.  CONCLUSION

For the reasons stated above, I recommend that Defendants' Motion for Summary Judgment (Doc. 30) be **GRANTED and the case DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 27th day of July, 2016.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE